UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CHRISTINE MCCULLOUGH DAVIS;
JOSEPH DAVIS for the ESTATE OF
MARK EDWARD DAVIS,

                              NO. CIV. S-03-2511 FCD PAN

        Plaintiffs,

    v.                        <u>MEMORANDUM AND ORDER</u>

COUNTY OF SAN JOAQUIN; OFFICER
B. JIMENEZ; OFFICER ELSEY;
OFFICER SANCHEZ; and DOES 1
through 50, inclusive,

        Defendants.
                              ----oo0oo----

    This matter is before the court on motion by defendant
County of San Joaquin ("County" or "defendant") for summary
judgment pursuant to Fed. R. Civ. P. 56(c).[1]  Plaintiffs, Davis'

---

    [1]    The remaining named defendants, Brandon Jimenez, Joe
Elsey, Jr., and Lenai Sanchez were dismissed by order dated March
28, 2005, pursuant to plaintiffs' Request for Partial Dismissal
and Order, filed March 23, 2005.  Consequently, the court refers
                                                (continued...)

1

mother, Christine McCullough Davis and son, Joseph Davis[2] (collectively "plaintiffs"), oppose the motion, asserting that triable issues exist.  In addition, plaintiffs request the motion be dismissed or deferred pursuant to Fed. R. Civ. P. 56(f) to provide plaintiffs additional time to conduct discovery and obtain an expert witness regarding decedent's cause of death. Court heard oral argument from parties' counsel on April 15, 2005.  For the reasons stated herein, defendant's motion for summary judgment is GRANTED in part, and plaintiffs' motion to defer ruling on the summary judgment motion under Fed. R. Civ. P. 56(f) is DENIED.

## BACKGROUND

Following are the facts taken in the light most favorable to plaintiff.  On March 1, 2002, decedent, Mark Edward Davis ("Davis" or "decedent"), was arrested by the Stockton Police Department for multiple felonies following a car chase, which ended in a collision.  (Pl.'s Resp. to Def.'s Und. Statement of Facts ("Pl.'s Resp. UF") ¶ 1.)[3]  After Davis' arrest, he was

---

[1](...continued)
throughout only to defendant, County of San Joaquin, despite the fact that the motion was filed on behalf of all defendants.

[2]     While the caption of the complaint indicates that the name of Davis' son is Joseph Davis, the body of the complaint refers to him as "Brent Davis".

[3]     Defendant objects to plaintiffs' Response Undisputed Facts ¶¶ 2,5, 6 and 8, which contained facts not included in defendant's Statement of Undisputed Facts.  Pursuant to E.D. Cal. Local Rule 56-260(b), "any party opposing a motion or summary judgment or summary adjudication shall *reproduce* the itemized facts that are undisputed and deny those that are disputed . . .."  Local Rule 56-260(b) does not provide for the party opposing the motion to include additional facts within the response to the
(continued...)

1  transported to the San Joaquin County Hospital for treatment of
2  injuries he sustained in the collision. (Id. UF  ¶ 3.) After
3  examination, the hospital staff determined that Davis was fit for
4  incarceration, cleared him for release, and transferred him to
5  the San Joaquin County Jail. (Id. ¶¶ 3, 4.)  Sometime shortly
6  after Davis' arrival at the Jail, Brandon Jimenez, a correctional
7  officer employed by the San Joaquin County Sheriff's Department,
8  conducted an initial intake evaluation of Davis.  (Dec. of
9  Brandon Jimenez in Supp. of Mot. for Summ. J. ("Jimenez Dec.") ¶
10  3.)  According to Jimenez, this examination occurred around 12:40
11  a.m., though he admits he cannot recall the exact time.  (Id.)
12  Among other questions, Jimenez asked Davis whether he was
13  suicidal.  (Id. ¶ 4; San Joaquin County Jail Intake Sheet
14  prepared on March 2, 2002, attached as Ex. D to Dec. of Robert
15  Rodriguez in Supp. of Mot. for Summ. J. ("Rodriguez Dec.").)  In
16  response, Davis denied having any suicidal ideations.  (Id.)
17  Jimenez states that "[a]t no time while I observed Mr. Davis did
18  he ever indicate he was suicidal.  In fact, at all time I
19  observed him, he was cooperative and had a calm demeanor."  (Id.
20  ¶ 5.)  Jimenez indicated on the County Jail Intake Sheet that he
21  called a nurse to perform a medical evaluation of Davis at 12:40
22  a.m. "According to jail policy and practices, if an inmate does
23  not display suicidal behavior or make statements that he or she
24  is going to harm himself or others, clothing and a belt will not

---

26  [3](...continued)
   movant's statement of undisputed facts, though the party may file
27  "a concise Statement of Disputed Facts."  E.D. Local Rule
   56.260(b).  The court construes plaintiffs' "undisputed facts"
28  2,5,6, and 8 as disputed facts properly submitted under the Local
   Rule.

1  be removed from the inmate.  Only money, jewelry and other

2  personal affects [sic] will be removed from all inmates when

3  booked."    (Ex. 1 to Dec. of David Washington in Supp. of Opp'n

4  to Summ. J. ("Washington Dec.").)[4]

5      At the conclusion of the initial intake evaluation, Davis

6  was escorted to have his photograph taken.  (Id.)  Davis then was

7  brought to the main seating section in the booking area and

8  apparently left unsupervised.[5]  (Id.)  Sometime shortly after

9  1:00 a.m., a booking nurse asked Jimenez to locate Davis, who had

10 not responded to her request that he report for a medical

11 examination.  (Jimenez Dec. ¶ 6.)  In an effort to locate Davis,

12 Jimenez knocked on the door of the single stall bathroom area to

13 which individuals in the booking area have access.  (Id. ¶ 7.)

14 There was no response.  (Id.)  After Jimenez noticed that the

15

16      [4]    Plaintiffs exhibits attached to the Washington
   Declaration are not properly identified or authenticated.  The
17 court issued a Minute Order April 7, 2005 directing plaintiffs'
   counsel to file a supplemental declaration identifying and
18 authenticated the exhibits on or before April 13, 2005.  The
   court received no supplemental declaration.  Accordingly the
19 exhibits should be stricken from the record as inadmissible
   evidence. Fed. R. Civ. P. 56(e).  However, the court considers
20 Exhibits 1 and 2 to the Washington declaration in deciding the
   motion for summary judgment notwithstanding the failure of
21 plaintiffs' counsel to properly identify them.  Based on the
   declaration submitted, the court can ascertain that the exhibits
22 are exact copies of documents provided by defendant in response
   to discovery requests and, based on the documents' subjects, can
23 infer that their general nature.  Exhibit 1 appears to be an
   incident report prepared after Davis' suicide.  It is entitled
24 "Documented Report San Joaquin County Sheriff's Department."
   Exhibit 2 is entitled "Booking" and states that it describes the
25 "Pre-Book and Pat Down Search" procedure, presumably of the San
   Joaquin County Jail.

26      [5]    This inference reasonably can be drawn from the
   evidence, including that no County employees indicate they were
27 with Davis during this period, and deputy Jimenez states he tried
   to locate Davis when he did not respond to the call for his
28 medical intake interview.

                                4

bathroom door was locked from the inside, he unlocked the door and discovered Davis hanging by his belt, which was attached to the handicap rail.  (Id.)  County employees unsuccessfully attempted to revive Davis by CPR, but he later died.  (Id. ¶ 8.)  The coroner determined, and all medical experts working on this case concur, that the cause of Davis' death was suicide by hanging.  (Pl.'s Resp. UF ¶ 11; Coroner's Autopsy Report at 6, Ex. F to Rodriguez Dec.)

On May 6, 2003, plaintiffs filed a complaint in the Superior Court of San Joaquin County asserting claims under 42 U.S.C. § 1983 for violation of decedent's Fourth, Fifth, Eighth and Fourteenth Amendment Rights, and state law claims for wrongful death pursuant to Cal. Code. Civ. P. § 377.60, and for common law negligence.  On December 2, 2003, defendants removed the action to this court.  After the close of formal discovery, on March 1, 2005, defendants filed the instant motion for summary judgment.

## STANDARD

Rule 56 allows a court to grant summary judgment on all or part of a claim or defense.  See Fed. R. Civ. P. 56(a); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

5

1    In considering a motion for summary judgment, the court must

2    examine all the evidence in the light most favorable to the

3    non-moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,

4    655 (1962).  If the moving party does not bear the burden of

5    proof at trial, he or she may discharge his burden of showing

6    that no genuine issue of material fact remains by demonstrating

7    that "there is an absence of evidence to support the non-moving

8    party's case."  <u>Celotex</u>, 477 U.S. at 325.  Once the moving party

9    meets the requirements of Rule 56 by showing there is an absence

10   of evidence to support the non-moving party's case, the burden

11   shifts to the party resisting the motion, who "must set forth

12   specific facts showing that there is a genuine issue for trial."

13   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

14   Genuine factual issues must exist that "can be resolved only

15   by a finder of fact, because they may reasonably be resolved in

16   favor of either party."  <u>Id.</u> at 250.  In judging evidence at the

17   summary judgment stage, the court does not make credibility

18   determinations or weigh conflicting evidence.  <u>See</u> <u>T.W. Elec.</u>

19   <u>Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626,

20   630-31 (9th Cir. 1987) (citing <u>Matsushita Elec. Indus. Co., Ltd.</u>

21   <u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  The evidence

22   presented by the parties must be admissible.  Fed. R. Civ. P.

23   56(e).  Conclusory, speculative testimony in affidavits and

24   moving papers is insufficient to raise genuine issues of fact and

25   defeat summary judgment.  <u>See</u> <u>Falls Riverway Realty, Inc. v. City</u>

26   <u>of Niagara Falls</u>, 754 F.2d 49, 57 (2d Cir. 1985); <u>Thornhill</u>

27   <u>Publ'g Co., Inc. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).

28   /////

**ANALYSIS**

**I.   Section 1983 Claim** – **Municipal Liability**

Plaintiffs contend that the County is liable under 42 U.S.C. § 1983 for violating decedent's Fourth, Fifth, Eighth and Fourteenth Amendment rights.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Municipalities are included among "person[s]" who may be held liable under § 1983.  <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 690 (1978).  However, a municipality may be held liable under § 1983 only when the municipality inflicts an injury; it may not be held liable under a theory of respondeat superior.  <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1185 (citing <u>Monell</u>, 436 U.S. at 694).  The Ninth Circuit recently discussed the two routes by which a plaintiff can seek to impose municipality liability under § 1983:

> First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so.  Alternatively, in limited situations, a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort.

<u>Id.</u> (internal citations omitted).

To impose liability using the first, "direct" route, the plaintiff can demonstrate that "the municipality acted with the state of mind required for the underlying [constitutional]

7

1 violation, just as a plaintiff does when he or she alleges that a
2 natural person has violated his federal rights." Id.

3    Under the second route to municipal liability, a plaintiff
4 can allege that, through its omissions, the municipality is
5 responsible for a constitutional violation committed by one of
6 its employees, even though the municipality's policies were
7 facially constitutional, the municipality did not direct the
8 employee to take the unconstitutional action, and the
9 municipality did not have the state of mind required to prove the
10 underlying violation. Id. at 1186.  The plaintiff must show that
11 the municipality's deliberate indifference led to its omission
12 and that the omission caused the employee to commit the
13 constitutional violation. Id.  To prove deliberate indifference,
14 the plaintiff must demonstrate that the municipality had actual
15 or constructive notice that its omission would likely result in a
16 constitutional violation. Id. (citing Farmer v. Brennan, 511
17 U.S. 825, 841 (1994)).

18    In the present case, plaintiffs allege four underlying
19 violations of decedent's constitutional rights.  The court will
20 address each in turn.

21    **A.   Fourth Amendment**

22    Plaintiffs' Fourth Amendment claim appears predicated on
23 allegations in the complaint that County employees "assaulted,
24 battered, and strangled" Davis prior to his death. (Pls.' Comp. ¶
25 31.)  In opposition to summary judgment, plaintiffs submitted no
26 evidence to support this allegation. (Deposition of Marvin
27 Pietruszka, M.D., at p. 65:1-10, Ex. A to Rodriguez Dec.; Dep. Of
28 Robert D. Lawrence, M.D., at p. 29:3-17, Ex. B to Rodriguez Dec.;

8

Dep. of John T. Cooper, M.D., at pp. 38:4-22, 47:2-18.)

Plaintiffs now concede that Davis' death was self-inflicted.

(Pls.' Resp. UF ¶ 11.)  In fact, plaintiffs do not specifically

address their Fourth Amendment claim in the memorandum in

opposition to summary judgment.  Accordingly the court finds

plaintiffs have failed to demonstrate a triable issue of fact

with respect to their claim that defendant violated decedent's

Fourth Amendment Rights.

### B.   Fifth Amendment

In the complaint, plaintiffs refer to the due process clause

of the Fifth Amendment.  However, the Fifth Amendment due process

clause applies only to actions of the federal government, not

those of state and local governments.  <u>Lee v. City of Los

Angeles</u>, 250 F.3d 668, 687 (9th Cir. 2001)(citing <u>Schweiker v.

Wilson</u>, 450 U.S. 221, 227 (1981)).  Instead, the Fourteenth

Amendment due process clause applies to state and local

government actions.  The sole remaining defendant, the County,

indisputably is not a federal entity.  Accordingly, plaintiffs

claim for violation of decedent's Fifth Amendment rights fails as

a matter of law.

### C.   Eighth Amendment[6]

The Eighth Amendment's prohibition of "cruel and unusual

punishment" applies only "after conviction and sentence." <u>Graham

v. Connor</u>, 490 U.S. 386, 393 & n. 6 (1989)(citing <u>Ingraham v.

---

[6]    The court cannot locate any express reference to an
Eighth Amendment claim in plaintiffs' complaint.  However, since
defendant moves for summary judgment of an Eighth Amendment claim
and the complaint can be construed to raise such a claim, the
court addresses the issue.

1  Wright, 430 U.S. 651, 671 n. 40 (1977)).  Pretrial detainees "are

2  not convicted prisoners." Carnell v. Grimm, 74 F.3d 977, 979 (9th

3  Cir. 1996).  Therefore, pretrial detainees are accorded no rights

4  under the Eighth Amendment.  See id.  Instead, their rights arise

5  under the Due Process Clause of the Fourteenth Amendment.  See

6  id. (citing Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244

7  (1983)).  Here, decedent had been arrested, but not tried or

8  convicted.  Thus, for purposes of the Eighth Amendment he was a

9  detainee, not a convicted prisoner.  Accordingly, plaintiffs'

10  Eighth Amendment claim fails as a matter of law.

11      **D.   Fourteenth Amendment**

12      "Persons in custody have the established right to not have

13  officials remain deliberately indifferent to their medical

14  needs." Gibson, 864 F.3d at 1461.  Jail officials "show

15  deliberate indifference to serious medical needs" if they fail to

16  provide access to medical and psychiatric care, including staff

17  who are "competent to deal with prisoners' problems." Id.;

18  Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir.

19  1988); Hoptowit v. Ray, 682 F.3d 1237, 1253 (9th Cir. 1982).

20  However, mere inadvertent failure to provide adequate medical

21  care does not constitute deliberate indifference.  Estelle v.

22  Gamble, 429 U.S. 97, 105-106 (1976).  To be liable for denying a

23  prisoner medical care, a person must "know of and disregard an

24  excessive risk to inmate health and safety." Gibson, 290 F.3d at

25  1187-1188.  Actual knowledge is required; it is insufficient that

26  the person is aware of facts from which the inference of risk

27  could be drawn, he must also draw the inference.  Id. (citing

28  Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001.)

10

1    Here, plaintiffs seek to hold defendant liable for

2 decedent's suicide.[7]  Specifically, plaintiffs allege that the

3 County itself inflicted an injury on decedent by adopting a

4 detainee intake policy which was deliberately indifferent to the

5 medical needs of decedent because, under the County's policy,

6 inmates who deny suicidal intentions but who could be concealing

7 such plans,  retain their clothing and belt during the booking

8 process.[8]  (Pls.' Opp'n at 4.)  It thus appears that plaintiffs

9 have chosen the direct route to liability outlined by the Ninth

10 Circuit in Gibson.  290 F.3d at 1185-1187.

11    Under this theory of municipal liability, "the focus is on

12 the municipality's 'policy, statement, ordinance, regulation or

13 decision. . ..'"  Id. at 1187.  To survive summary judgment,

14 plaintiff must demonstrate that a reasonable jury could conclude

15 that the County (1) had a policy that posed a substantial risk of

16 serious harm to Davis, and (2) knew that its policy posed such a

17 risk.  Id. at 1188-1189.

18

19      [7]   As articulated in the complaint, plaintiffs' Fourteenth
   Amendment claim is predicated on the fact that County employees
20 violently assaulted decedent, thereby causing his death.  The
   evidentiary support for such allegations has not materialized,
21 and plaintiffs now concede that decedent in fact committed
   suicide.  (See Pls.' Resp. UF ¶ 11.)
22

23      [8]   Plaintiffs also make reference in the opposition to the
   fact that "the San Joaquin Police Department failed to train its
24 employees on how to properly assess and process suicidal-risk
   detainees."  (Id. at 5.)  However, plaintiffs have submitted no
25 evidence, such as expert opinion testimony, from which a jury
   could infer that the County's training was inadequate.  In fact,
26 there is no evidence at all regarding the training actually
   provided to Jimenez and other officers and how it was inadequate.
27 Assuming plaintiffs in fact intended to assert a Monell claim for
   failure to train, plaintiffs have failed to meet their burden of
28 demonstrating the existence of a triable issue with respect to
   such a claim.  Accordingly, the court GRANTS summary judgment.

11

1     Neither party accurately summarizes the evidence submitted

2 regarding defendant's policy.  Defendant appears to contend that

3 the record contains no evidence regarding its policies.   By

4 contrast, plaintiffs characterize the County policy as follows:

5          In the policy of the San Joaquin County the interview
           question regarding suicide is the only basis of
6          evaluating whether a person is suicidal, which does not
           consider that the mere question may put the idea in a
7          border line person or that the person may wish to
           conceal their true thoughts from authorities.  If the
8          detainee responds in the negative to this question, the
           detainee is allowed to keep their [sic] belt an [sic]
9          other items which they can hang themselves.  During the
           remainder of the booking process detainees are left
10         alone with little or no supervision and have access to
           a bathroom, which they can lock themselves inside.
11 Pls.' Opp'n at 4.

12     However, plaintiffs submit insufficient evidence for a jury

13 finding that defendant has a practice or policy of leaving

14 inmates unsupervised during portions of the booking process.

15 While it is true that Davis apparently was left unattended *in*

16 *this case*, proof of a single incident is insufficient to

17 establish a custom or policy.  <u>Cabrales</u>, 864 F.2d at 1460 (citing

18 <u>City of Oklahoma v. Tuttle</u>, 471 U.S. 808, 823 (1985).  Moreover,

19 the County's policy appears to consider several factors,

20 including a detainee's response to the question regarding

21 suicide, in determining whether the detain should retain his or

22 her clothing during the booking process.  (<u>See</u> Exs. 1 and 2 to

23 Washington Dec.)

24     The following is a summary of the evidence actually

25 submitted regarding the County's policy with respect to intake

26 and booking of pretrial detainees:

27     •     The County Jail has an Initial Intake Evaluation

28           procedure pursuant to which a County employee questions

                                12

detainees regarding drug use, suicidal thoughts, and past suicide attempts.  In addition the employee records observations regarding whether the detainee's behavior "appears bizarre, suicidal or assaultive," or appears to be under the influence of drugs or alcohol. In addition, the employee must record whether he or she has called a nurse to perform a medical evaluation of the detainee.  (County Jail Intake Sheet, Ex. D to Rodriguez Dec.)

- "According to jail policy and practices, if an inmate does not display suicidal behavior or make statements that he or she is going to harm himself or others, clothing and a belt will not be removed from the inmate.  Only money, jewelry and other personal affects [sic] will be removed from all inmates when booked." (Ex. 1 to Washington Dec.)

- At or around the time of the initial intake evaluation, the detainee is subjected to a pat-down search of his/her body and clothing.  After the pat down search, the officer removes the detainee's handcuffs and directs the arrestee to remove his/her shoes, socks and belt.  The Booking Officer inspects the shoes, socks and belt for contraband, and, if none is found, returns the items to the detainee "to keep them on his/her person until he/she is formally booked and processed." (Ex. 2 to Washington Dec.)

- A Medical evaluation by a nurse follows the initial intake evaluation.  (County Jail Intake Sheet Question

13

1    17, Ex. D to Rodriguez Dec.)

2  •  Prior to being classified and housed at the San Joaquin

3     County Jail, detainees undergo a psychiatric evaluation

4     (Kelso Dec. ¶ 8.)

5    Thus, the question presented is whether a reasonable jury

6 could find that the above-outlined policy posed a substantial

7 risk of serious harm to Davis.  The court finds that a reasonable

8 jury could not so find.  From the evidence submitted, it appears

9 that, under the County's policy, County employees question

10 detainees regarding their propensity for suicide on three

11 occasions prior to their being housed at the Jail: at their

12 initial intake by a non-medical employee, by a nurse during the

13 medical interview, and finally during a psychiatric evaluation.

14 (Kelso Dec. ¶¶ 6-8.)  No reasonable jury could conclude that this

15 policy, under which law enforcement and trained medical staff

16 attempt at multiple stages to identify individuals who pose a

17 suicide risk, posed a substantial risk of harm to Davis.  <u>See</u>

18 <u>e.g.</u>, <u>Gibson</u>, 290 F.3d at 1189 (noting that County policy of

19 screening all incoming detainees for "obvious" signs of mental

20 illness and providing treatment, if necessary was "assuredly

21 constitutional.")  Nor did the County's policy of permitting

22 detainees to retain their clothing, including shoes, socks and

23 belts, until formally booked and processed – unless their

24 behavior or statements indicates they pose a threat to themselves

25 or others – pose a substantial risk of harm to Davis.

26 Essentially, plaintiffs contend that the County must treat all

27 detainees as presumptive suicide risks, even if they expressly

28 state that they are not suicidal and do not otherwise appear to

14

be a danger to themselves or others.  This is not required by the

Fourteenth Amendment.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. at 105-106

("mere inadvertent failure to provide adequate medical care does

not constitute deliberate indifference."); <u>Gibson</u>, 290 F.3d at

1187-1188 (finding that a person must "know of and disregard an

excessive risk to inmate health and safety" to be liable for

denying a prisoner medical care); <u>see</u> <u>also</u> <u>Sibley v. Lemaire</u>, 184

F.3d 481 (5th Cir. 1999)(affirming summary judgment and finding

deputies' were not deliberately indifferent to detainee's medical

needs where deputies failed to call doctor when pretrial

detainee's mental condition appeared to worsen but nothing that

detainee did clearly indicated an intent to harm himself);

<u>Williams v. Kelso</u>, 201 F.3d 1060 (8th Cir. 2000)(affirming

summary judgment of § 1983 claim that prison officials were

deliberately indifferent to medical needs of detainee who

committed suicide and holding that officials were not required by

the Eighth Amendment to provide immediate medical attention to a

disoriented, confused, belligerent detainee who smelled of

alcohol, in the absence of any indication of harm to himself).

**II.        Rule 56(f) Continuance**

Rule 56(f) permits a court to deny or continue a motion for

summary judgment if the opposing party demonstrates through

affidavit that he cannot present facts essential to him

opposition and further discovery is necessary to allow the

opposing party to obtain the necessary information.  Fed. R. Civ.

P. 56(f).  The opposing party bears the burden of showing that

the additional evidence sought exists, and that it would prevent

summary judgment.  <u>Chance v. Pac-Tel Teletrac, Inc.</u>, 242 F.3d

1  1151, 1161 n. 6 (9th Cir. 2001).  "The mere hope that further

2  evidence may develop prior to trial is an insufficient basis for

3  a continuance under Rule 56(f)."  <u>Continental Maritime of San</u>

4  <u>Francisco, Inc. v. Pacific Coast Metal Trades District Council</u>,

5  817 F.2d 1391, 1395 (9th Cir. 1987).  Granting a Rule 56(f)

6  request is particularly inappropriate when the party has failed

7  to diligently pursue discovery throughout the course of the

8  litigation.  <u>Chance</u>, 242 F.3d at 1161 n. 6.

9       Initially, the court notes that plaintiffs' counsel has

10  failed to comply with the requirements of Rule 56(f).  While it

11  in not necessarily fatal that plaintiffs did not separately move

12  for a continuance, plaintiffs failed file any affidavit to

13  support their request.  Fed. R. Civ. P. 56(f); <u>Garrett v. City</u>

14  <u>and County of San Francisco</u>, 818 F.2d 1515, 1518 (9th Cir. 1987)

15  (pending motion to compel discovery sufficient to raise Rule

16  56(f) consideration).  Moreover, plaintiffs did not identify any

17  discovery that would assist them in opposing summary judgment.

18  Plaintiffs indicate they need additional time to find an expert

19  on decedent's cause of death.  However, plaintiffs no longer

20  dispute that decedent's death was self inflicted.  (<u>See</u> Pl.'s

21  Resp. UF ¶ 11.)  Plaintiffs' entire theory now turns on

22  defendant's failure to prevent decedent's suicide.  Under these

23  circumstances, the court cannot see how an expert on cause of

24  death will affect the outcome of this case.

25       Certainly, plaintiffs' evidence is weak, and the court could

26  imagine that plaintiffs' claims would be bolstered by additional

27  evidence regarding the County's policies, practices and training

28  procedures.  However, plaintiffs fail to identify such evidence

1  or to demonstrate that such evidence likely exists and would

2  defeat summary judgment.  See Chance, 242 F.3d at 1161 n. 6.

3  Moreover, this is not a situation in which defendants filed a

4  summary judgment motion before plaintiff has had a full

5  opportunity to pursue discovery and obtain the evidence necessary

6  to defeat a summary judgment motion.  Discovery closed on

7  February 1, 2005, and plaintiffs were required to identify any

8  expert witnesses by November 22, 2004.  Plaintiffs did not move

9  to amend the court's pretrial scheduling order to extend

10  discovery, and they have not explained why they were unable to

11  obtain the necessary evidence during the allotted time for

12  discovery.  The court finds that, under these circumstances, a

13  continuance under Rule 56(f) is unwarranted.

14  **III. State Law Claims**

15      Subject to the conditions set forth in 28 U.S.C. § 1367(c),

16  district courts may decline to exercise supplemental jurisdiction

17  over state law claims.  See Acri v. Varian Associates, Inc., 114

18  F.3d 999, 1000 (9th Cir. 1997)(en banc).  The court's decision

19  whether to exercise supplemental jurisdiction should be informed

20  by values of "economy, convenience, fairness, and comity."  Id.

21  at 1001 (citations omitted).  However, primary responsibility for

22  developing and applying state law rests with the state courts.

23  Therefore, when federal claims are eliminated before trial,

24  district courts should usually decline to exercise supplemental

25  jurisdiction.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343,

26  350 (1988); Gini v. Las Vegas Metropolitan Police Dept., 40 F.3d

27  1041, 1046 (9th Cir. 1994) (citing Schneider v. TRW Inc., 938

28  F.2d 986, 993 (9th Cir. 1991)).  Because all federal claims have

17

1  been dismissed, the court declines to exercise supplemental

2  jurisdiction over plaintiffs' remaining state law claims.

3                              **CONCLUSION**

4       For the foregoing reasons, the court makes the following

5  orders:

6       (1)  Plaintiffs' motion to defer ruling on the summary

7  judgment motion to enable plaintiffs to conduct further discovery

8  is DENIED.

9       (2)  Defendant's motion for summary judgment of plaintiffs'

10 § 1983 claims is GRANTED.

11      (3)  The court declines to exercise supplemental

12 jurisdiction over plaintiffs' state law claims.  Such claims are

13 hereby remanded to the Superior Court of San Joaquin County.

14           IT IS SO ORDERED.

15 DATED: April 25, 2005

16                         /s/ Frank C. Damrell Jr.
                           FRANK C. DAMRELL, Jr.
17                         UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28